UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT NAZARIO,

               Petitioner,

      -against-

CHRISTOPHER MILLER,

              Respondent.

**ORDER**

15 Civ. 2892 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On April 7, 2015, pro se Petitioner Robert Nazario filed a petition for habeas corpus pursuant to 28 U.S.C. § 2254, seeking to vacate his New York State conviction for murder in the second degree. (Pet. (Dkt. No. 1)) On June 10, 2015, this Court referred the petition to Magistrate Judge Sarah Netburn for a Report and Recommendation ("R & R"). (See Order (Dkt. No. 5)) On December 28, 2015, Judge Netburn issued an R & R recommending that the petition be denied. (R & R (Dkt. No. 25)) For the reasons stated below, this Court will adopt the R & R in its entirety, and Nazario's petition will be denied.

**BACKGROUND**

**I.    THE INDICTMENT**

Corrections Officer Scott Barker was killed by knife wounds to his neck in the early morning hours of February 23, 1990, in the midst of an altercation with another man – Hector Lopez – outside "Sully's," a bar in the Bronx. (See Pet. (Dkt. No. 1) at 5; R & R (Dkt. No. 25) at 2) No charges resulted from the New York City Police Department's initial investigation into Barker's murder, but NYPD Detective Kevin Tracy – who focuses on "cold" cases – began investigating anew in 1997, and collected evidence suggesting that Nazario was Barker's killer. (Pet. (Dkt. No. 1) at 5; Resp. Br. (Dkt. No. 9) at 4) On December 27, 2001,

Nazario was arrested for this crime, and on January 11, 2002, a grand jury returned an indictment charging him with two counts of murder in the second degree, manslaughter in the first degree, and criminal possession of a weapon in the fourth degree.  (Indictment (Dkt. No. 9-12) at 28-31)

The First Count and Second Counts of the Indictment read as follows:

FIRST COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANT ROBERT NAZARIO OF THE CRIME OF MURDER IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANT, ROBERT NAZARIO, ON OR ABOUT FEBRUARY 23, 1990, IN THE COUNTY OF THE BRONX, WITH INTENT TO CAUSE THE DEATH OF A PERSON, DID CAUSE THE DEATH OF SCOTT BARKER BY CUTTING HIS THROAT WITH A SHARP METAL OBJECT.

THE SUBJECT MATTER OF THIS COUNT IS AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

SECOND COUNT

THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANT ROBERT NAZARIO OF THE CRIME OF MURDER IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANT, ROBERT NAZARIO, ON OR ABOUT FEBRUARY 23, 1990, IN THE COUNTY OF THE BRONX, UNDER CIRCUMSTANCES EVINCING A DEPRAVED INDIFFERENCE TO HUMAN LIFE, DID RECKLESSLY ENGAGE IN CONDUCT WHICH CREATED A GRAVE RISK OF DEATH TO ANOTHER PERSON, AND THEREBY CAUSED THE DEATH OF SCOTT BARKER, BY CUTTING HIS THROAT WITH A SHARP METAL OBJECT.

THE SUBJECT MATTER OF THIS COUNT IS AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

(Id. at 29) (emphasis in original).  Both sides agree that the Indictment's characterization of the subject matter of these charges as an "armed felony" is incorrect.[1]  (Pet. (Dkt. No. 1) at 7; Resp. Br. (Dkt. No. 9) at 14)

## II.    TRIAL

The charges against Nazario proceeded to trial in Bronx County Supreme Court on March 23, 2006.  Nazario waived his right to a jury trial.  Accordingly, the presiding judge, Supreme Court Justice Caesar Cirigliano, served as the fact-finder.  (See Trial Tr. ("Tr.") at 72-73)

### A.    The Evidence at Trial

### 1.    The People's Case

Michael Fanzo testified that on the night of Barker's death, he arrived at Sully's with Nick Ludovico.  Inside the bar Fanzo "bumped into Hector Lopez and my friend Rob [Nazario]."  (Id. at 711)  Fanzo had known Nazario since age ten or twelve, because they had

---

[1] Section 1.20(41) of the New York Criminal Procedure Law defines an "armed felony" as "any violent felony offense defined in section 70.02 of the penal law that includes as an element either:  (a) possession, being armed with or causing serious physical injury by means of a deadly weapon, if the weapon is a loaded weapon from which a shot, readily capable of producing death or other serious physical injury may be discharged; or (b) display of what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm."  N.Y. Crim. Proc. Law § 1.20(41) (McKinney).  Section 70.02 of the Penal Law, in turn, lists a number of crimes that qualify as a "violent felony offense."  Murder in the second degree is not one of the offenses listed, although attempted murder in the second degree is.  See N.Y. Penal Law § 70.02(1)(a) (McKinney) (including "an attempt to commit . . . murder in the second degree as defined in section 125.25" as a violent felony offense).  Even if murder in the second degree were a "violent felony offense" under this provision, the offense charged in the First Count does not involve a firearm, and accordingly the charged offense does not fall within the definition or an "armed felony."  See People v. Scarpetta, 114 A.D.2d 766, 767 (1st Dept. 1985) ("[A] felony committed with a weapon other than a firearm is not an armed felony.  Defendant's robbery offenses each involved the use of a knife but no firearm.  Consequently, the sentencing of defendant as an armed felony offender was illegal . . . .").

lived in the same neighborhood.  (Id. at 707)  Fanzo also knew Lopez "from the neighborhood."

(Id. at 712)  Fanzo – who testified that he had consumed "quite a few beers" during the night (id.

at 735) – stated that he and Scott Barker – whom Fanzo had just met – "got into a little

argument," because Barker "was making fun of [Fanzo's] name and stuff."  They "w[ou]nd up

going outside.  (Id. at 711-12)  But Barker was "mostly joking around . . . and [they] hand shaked

and hugged."  (Id. at 712)  Subsequently, however, "[Lopez] and Scott started getting into it . . .

[o]utside . . . in front of the bar," and Fanzo testified that "Scott just pick[ed] [Lopez] up and

slamm[ed] him on the floor," and "was on top of him," and "had [Lopez] pinned," with his knees

on either side of Lopez's lower chest and abdomen, and holding Lopez's arms on the ground.

(Id. at 713, 723-24)

       Fanzo then "saw Rob [N]azario just run over to his car, [and] open[] his door, and

. . . c[o]me running back" across the street "with his hand closed really tight."  (Id. at 713, 779)

"When he came running back," Nazario "[p]ut Scott Barker in a headlock," and Fanzo "saw a

quick motion going across, and like a few seconds later . . . [he] saw Scott holding his neck."

(Id. at 713-14)  Fanzo testified that this "quick motion" consisted of Nazario's "right hand

c[oming] across the front of [Barker's] neck almost to the crook of [Nazario's] elbow," and

Nazario "ma[king] a swiping motion going to the right."  (Id. at 725)  After that, Barker "was

just holding his neck and [Fanzo] just saw blood."  (Id. at 757)  Fanzo did not actually see

Nazario cut Barker's neck, however, and Fanzo did not see the object in Nazario's hand with

which he made the "quick sweep" across Barker's neck.  (Id.)  While Fanzo initially indicated

that Nazario was positioned on Barker's left at this time (id. at 725), he subsequently testified

that "when [Nazario] ran up, he came around on the right."  (Id. at 791-92)

Fanzo watched Barker holding his neck for a few moments, and then "heard a screech." A car containing Ludovico, Lopez, and Nazario "pulled up on top of the sidewalk and [someone] told [Fanzo] to get the fuck in the car." (Id. at 714) Fanzo and a woman he was with got into the car, and they drove to Van Nest Avenue and Garfield Street. Everyone then got out of the car. Fanzo testified that "Hector and Rob were taking their clothes off, and they threw everything in the sewer, and they just told everybody to go the fuck home and that was basically it." (Id. at 714-15)

Thomas Cataldo testified that he arrived at Sully's at about 11:00 p.m. on February 22, 1990, and remained at the bar through closing time at 4:00 a.m. on February 23. (Id. at 326, 328) Cataldo had known Barker since age thirteen, and Barker was Cataldo's best friend. Cataldo socialized with his sister, Carlanne Cataldo, and with Barker at Sully's that evening, and consumed about four drinks. (Id. at 327-28) At closing time, he and the bar's other customers walked outside. At that point, "[t]here w[ere] some words" between Barker and Mike Fanzo. (Id. at 328-29) That argument was resolved without any physical altercation, but then another man in Fanzo's group – whom Cataldo later learned was Hector Lopez – began "egging [Barker] on, . . . apparently . . . want[ing] to fight" Barker. (Id. at 330)

Barker – who "was a big kid," at six feet tall and 240 pounds – went after Lopez, got on top of him, and straddled him, sitting on Lopez's stomach and holding Lopez's arms, by his wrists, against the ground. (Id. at 331-32) Cataldo – who was standing about fifteen feet away – looked at the crowd, worried that someone would hurt Barker while he had Lopez on the ground. Cataldo then observed two men come out of the bar and head towards Barker; Cataldo grabbed them by their shirts. (Id. at 333-34, 346)

Cataldo then heard Barker yell, and he turned his head back towards Barker. (Id. at 335) Cataldo then saw Nazario approaching the crowd from a car across the street. (Id. at 349) Barker was "still on top of [Lopez]," but then Cataldo "saw [Barker] let go of [Lopez's] hands," and lift his hands towards his neck. (Id. at 335-36) Cataldo testified that as Barker raised his hands to his neck, Nazario "was standing right next to him, practically on top of him," directly to Barker's right side. (Id. at 336, 344) Although ten or eleven people were standing outside the bar, only Nazario was "immediately in the vicinity" of Barker and Lopez. (Id. at 341)

Cataldo then observed Nazario and Lopez run across the street towards a parked car. Cataldo approached Barker – who was holding his neck, which was bleeding – and then chased after Nazario and Lopez. Cataldo observed Nazario and Lopez, and one or two others, enter the car, and Cataldo memorized the license plate number. (Id. at 336-38) Cataldo testified that he did not actually observe Nazario – or anyone else – slash Barker's neck. (Id. at 372)

Carlanne Cataldo – Thomas Cataldo's sister – testified that she arrived at Sully's between 3:30 and 4:00 a.m. on February 23, 1990, after having consumed a couple of drinks elsewhere. Carlanne observed her brother Thomas and Scott Barker, whom she had known for most of her life, at the bar. (Id. at 466-67, 469) She also saw Nazario – who lived in the same area as her boyfriend – and Lopez at the bar. (Id. at 468) Carlanne remained at the bar until closing time. Carlanne testified that Barker and Mike Fanzo began arguing as the bar was closing and customers were leaving. After that argument broke up, Lopez and Barker "started scuffling." (Id. at 469-71) Carlanne – who was four or five feet from the two men (id. at 487) – testified that Barker "pinned [Lopez] to the floor. He had his hands down. . . . [Lopez] couldn't

do anything at this point. He was pinned to the floor. . . . [Barker] had his hands on [Lopez's] wrists and [Lopez's] wrists were on the concrete." Barker "was over [Lopez's] body, his one leg on one side and one leg on the other side." (Id. at 471, 472)

While Barker and Lopez were fighting, Nazario was "standing right next to them," at Barker's right side. (Id. at 491) When Barker pinned Lopez to the ground, Lopez "gave up trying to fight." (Id. at 473) But Barker then "let go of [Lopez's] hands [and] grabbed [Barker's] throat." Carlanne observed that Barker "was bleeding pretty bad.' (Id. at 474, 475)

Carlanne testified that she did not see anything in Nazario's hands when Barker got injured, nor did she observe Nazario make any motions. (Id. at 492) However, when Barker sustained the injury to his neck, "there w[ere] only two people close to [Barker], one which was [her], and the other, which was [Nazario]." Lopez was on the ground beneath Barker. (Id. at 503) After Barker released Lopez and reached for his own neck, "everybody started running across the street, they scattered. . . .[A] kid named Claudio, [Fanzo], Hector [Lopez], Rob [Nazario], they all ran across the street and hopped into a car." (Id. at 495-96)

The People also called Peter Pecovic. Pecovic first met Nazario in 1993 – three years after Barker's murder. (Id. at 256) The two men became "best friends," and Pecovic served as the best man at Nazario's wedding and the godfather to his child. (Id. at 178-79) According to Pecovic, one night in late 1994 or 1995, he and Nazario were drinking, and possibly using drugs, at Sully's – which by then was called Gleason's. (Id. at 182, 259, 262-63) Pecovic asked Nazario what had happened the night the corrections officer was killed, and Nazario told him he "almost cut his fucking head off." (Id. at 184) Pecovic did not disclose this information to law enforcement until 2001. (Id. at 296)

7

The People also called Dr. James Gill, Bronx County's Deputy Chief Medical Examiner. Gill had reviewed Barker's autopsy records, and explained that Barker had suffered "two incised wounds or cuts . . . in front of [his] neck." (Id. at 434) The first was "a seven inch long wound" that was two inches deep at its deepest point. (Id. at 434, 435) Part of this wound "was on the left front of the neck, and then the rest had an upward trajectory towards the backside of the neck , , , follow[ing] along the jawbone, towards the right ear lobe." (Id. at 434) The second wound was just below the first, "was nine inches in length[,] and involved the right side of the neck . . . [and] tracked up behind the right ear." (Id. at 435) This wound was also about two inches deep at its deepest point. (Id.) Dr. Gill testified that the person who had inflicted these injuries was "behind the decedent and to the right." (Id. at 441)

Dr. Charles Hirsch, the City of New York's Chief Medical Examiner, described the wounds similarly, and also opined that "Mr. Barker's assailant was behind him when his neck was cut." (Id. at 1116)

## 2.    **The Defense Case**

Nazario called two witnesses – Nicola Claudio Ludovico and Bernard McCaffrey – and also testified in his own defense.

Ludovico testified that he "kn[e]w [Nazario] from the neighborhood, though they "don't socialize." The same was true for Hector Lopez – they were "just . . . guys from the same neighborhood who go to the same bars." (Id. at 606) Ludovico was at Sully's the night of the incident, and testified that he saw "[Lopez] on the ground with the guy [Barker] on top of him and there was two guys fighting, and then there was three guys fighting, and . . . the man came up . . . holding his neck." (Id. at 601, 605) The third man to enter the fray was Nazario: ". . . it

8

was [Lopez] and the fella, and then there was Robert [Nazario]." (Id. at 607) "[W]hen it was three, the guy got up bleeding." Ludovico did not see Barker stand up and hold his neck, or see any blood, until after Nazario became involved in the altercation. (Id. at 624-26) Ludovico did not observe Nazario "do anything" in particular. "He was just part of the fight." (Id. at 607)

McCaffrey was working as a bartender at Sully's on February 23, 1990. (Id. at 926) After closing time, McCaffrey was sitting in the bar having a drink when his co-worker ran out of the bar to try to break up an altercation on the sidewalk outside the bar. McCaffrey followed him. (Id. at 927) Once outside, McCaffrey "saw two individuals fighting" and a number of people around them. McCaffrey "tried to grab one of them" – the person on top – "off, to break the fight up," and succeeded in grabbing the man from behind. (Id. at 928) As a result, McCaffrey "end[ed] up being covered with blood." (Id. at 929) He "propped the victim up, [and] ran into the bar to call 911." (Id.) In McCaffrey's statement to police at the time of the offense, McCaffrey reported that while he was calling a ambulance, he "saw a short male, possibly Hispanic or Italian, . . . jump into a vehicle . . . . Two other persons got in with him." (Id. at 940)

Nazario testified that on February 23, 1990, he was on bail, awaiting sentencing on a robbery charge to which he had pled guilty the previous month. (Id. at 962) Nazario arrived at Sully's – where his ex-girlfriend worked – at about 11:00 p.m. on February 22, 1990. At about midnight, he escorted her home. He then returned to Sully's. (Id. at 963) By the time he arrived back at the bar, the lights in the bar were on, and the bar's customers were coming out. Nazario saw that "[t]here was an argument going on with Mikey Fanzo" outside. (Id. at 964-65) "[E]verybody was just screaming," and there was "just a lot of things happening." Nazario

walked to his car to leave.  (Id. at 966, 968)

As Nazario put his key in the car's ignition, a "fight br[oke] out."  Nazario saw "Scott [Barker] . . . on top of Hector."  (Id. at 968)  Nazario "went over . . . towards Scott [Barker]."  (Id.)  But "[w]hen [he] got over there, [Barker] was already getting up . . . he was bleeding."  (Id. at 969)  Nazario did not see how Barker sustained his injuries.  (Id.)  Nazario ran away from the scene and got into a car with others, including Lopez and "Mikey" Fanzo.  (Id. at 970-71)

The defense also called Dr. Elliot Gross, New York City's former Chief Medical Examiner.  (Id. at 662)  Gross testified that "from one wound or even two wounds [a doctor] can't formulate an opinion with reasonable medical certainty as to which position the deceased was in."  (Id. at 689-90)

### B.  The People's Motion to Amend the Indictment

On May 2, 2006, after both sides had rested – but before summations – defense counsel moved for a directed verdict on the two counts charging murder in the second degree, on the ground that each count referred to "the subject matter of [the] count" as an "armed felony." (Tr. at 1404-05; Indictment (Dkt. No. 9-12) at 29-30)  The People responded that the language cited by defense counsel was "meaningless" surplusage that "in no way[] alters or changes the theory of prosecution . . . [or] inures to the prejudice of [the Defendant]."  (Id. at 1405)  The prosecution then moved to amend the indictment to strike the language cited by defense counsel. Justice Cirigliano granted the motion, explaining "I don't think it changes the theory of prosecution, nor does it [in] any[]way prejudice [the Defendant]."  (Id. at 1407)  The parties agreed that the court should consider only the First Count of the Indictment, with the remaining

charges dismissed.  (Id. at 1410-1411)  On May 10, 2006, Justice Cirigliano pronounced Nazario

guilty of murder in the second degree.  (Id. at 1520-21)  Justice Cirigliano explained his verdict

as follows:

> [T]his Court finds that . . . the defendant . . . went across th[e] street, had the opportunity
> to get a weapon, . . . came back to the right side of Mr. Barker . . . did stroke and cut his
> neck twice, [and] that the slashes were consistent with where the defendant was standing,
> [and] that the defendant thereafter fled the scene.  (Tr. 1520)

> [Justice Cirigliano further found that no witness's testimony was] "inconsistent with any
> of the testimony of the other witnesses"; [any differences in what the witnesses reported
> reflected different points in time] "as the scenario progress[ed]."  (Id. at 1519-20)

> [Justice Cirigliano stated that he] "was very comfortable in finding" [Nazario guilty].
> There [was] no question in [the court's] mind that [Nazario] committed that crime.  (Id. at
> 1521)

On September 12, 2006, Justice Cirigliano sentenced Nazario to an indeterminate

sentence of twenty years to life imprisonment.  (Sentence Tr. at 13)

## III.    APPELLATE AND HABEAS PROCEEDINGS

With the assistance of counsel, Nazario appealed his conviction to the Appellate

Division, First Department.  Nazario argued that the nearly-twelve-year period between the

crime and Nazario's arrest and prosecution denied him due process under the New York State

constitution.  (July 2010 Br. (Dkt. No. 9-1))

On November 1, 2010, Nazario filed a pro se supplemental brief, arguing that the

evidence was insufficient because no witness had testified that he or she saw Nazario cut

Barker's throat.  (Nov. 1, 2010 Supp. Br. (Dkt. No. 9-2))

On April 25, 2011, Nazario moved to supplement his pro se brief to add a claim

that the indictment in his case had been amended in violation of New York Criminal Procedure

Law §§ 200.50 and 200.70.  (Johnson Decl. (Dkt. No. 8) ¶ 10)

On June 11, 2011, the First Department issued an opinion affirming Nazario's conviction, and denying his motion to amend his pro se supplemental brief.  See People v. Nazario, 85 A.D.3d 577, 577-78 (1st Dept. 2011).  The First Department acknowledged that the pre-arrest delay "was significant," but found that the delay "was not due to bad faith," was "satisfactorily explained," and reflected "permissible exercises of prosecutorial discretion."  Id. at 577.  The court also stated that it had "considered and rejected defendant's pro se challenge to the sufficiency of the trial evidence."  Id. at 578.  On October 26, 2011, the New York Court of Appeals denied Nazario leave to appeal the First Department's decision.  See People v. Nazario, 17 N.Y.3d 904 (2011).

On April 10, 2012, Nazario moved pursuant to New York Criminal Procedure Law § 440.20[2] to vacate his sentence.[3]  (See Mot. (Dkt. No. 9-5))  Nazario's motion was denied on February 28, 2013.  (See Decision & Order (Dkt. No. 9-7))  Between the filing of the Section 440.20 motion and the issuance of a decision on that motion, Nazario filed a habeas petition in this District.  In his habeas petition, Nazario again argued that his arrest and prosecution were unconstitutionally delayed, and that the evidence at trial was insufficient to prove his guilt beyond a reasonable doubt.  (See No. 12 Civ. 7450 (LAP) Pet. (Dkt. No. 1))  On January 14, 2013, Judge Preska dismissed Nazario's petition for failure to exhaust state remedies.  (See No.

_____

[2]  Section 440.20 of the Criminal Procedure Law provides, in relevant part, that "[a]t any time after the entry of judgment, the court in which the judgment was entered may, upon motion of the defendant, set aside the sentence upon the ground that it was unauthorized, illegally imposed or otherwise invalid as a matter of law."  N.Y. Crim. Proc. Law § 440.20 (McKinney).

[3]  In his motion, Nazario asserted that (1) the People had failed to file a statement setting forth his predicate felony convictions; and (2) the trial court had failed to state Nazario's offense when imposing sentence.  (See Nazario Aff. (Dkt. No. 9-5))

12 Civ. 7450 (LAP) Order of Dismissal (Dkt. No. 4))

On January 23, 2013, Nazario moved before the First Department for a writ of coram nobis, contending that he had been denied the effective assistance of appellate counsel. (See Mot. (Dkt. No. 9-9))  Nazario asserted that his appellate lawyer "should have raised ineffective assistance of trial counsel for not making a proper objection to the trial court's decision to . . . modify[] the indictment against appellant."  (Nazario Aff. (Dkt. No. 9-9) ¶ 10) Nazario's application for a writ of coram nobis was denied on November 14, 2013; his request for leave to appeal that decision was denied on August 26, 2014.  (See Decision & Order (Dkt. No. 9-11); People v. Nazario, 23 N.Y.3d 1065 (2014))

Nazario filed the instant habeas petition on April 7, 2015.  (See Pet. (Dkt. No. 1)) In his petition, Nazario argues that (1) his "right to due process under the New York State Constitution was violated by the failure to arrest and prosecute him for almost twelve years"; (2) his sentence "is incomplete as well as invalid because the sentencing court failed to specify the offense that the sentence was being imposed upon and also failed to adjudicate and thereafter sentence defendant as a 2nd felony offender"; (3) his appellate counsel was ineffective "for failing to raise a solidly meritorious argument that the trial court exceeded its authority by amending the indictment. . . . and that appellate counsel should have raised ineffective trial counsel for not making a proper objection to the trial court's decision to . . . modify[] the indictment"; and (4) "the evidence was legally insufficient to prove Petitioner's guilt beyond a reasonable doubt, where none of the prosecution witnesses indicated that Petitioner caused the injuries sustained by the deceased."  (Id. at 4-7)

Nazario has since abandoned the first two grounds set forth in his petition, leaving

only his ineffective assistance of counsel and sufficiency of the evidence claims.  (See Pet. Reply Br. (Dkt. No. 23) at 5-6 ("As two of the issues originally included in the habeas petition are unexhausted, or do not constitute an unreasonable application of the applicable federal precedent, Petitioner will abandon them in the interest of expediency and brevity."))  On June 10, 2015, this Court referred Nazario's petition to Magistrate Judge Netburn for an R & R.  (Order (Dkt. No. 5))

## IV.    JUDGE NETBURN'S REPORT AND RECOMMENDATION

On December 28, 2015, Judge Netburn issued an R & R recommending that Nazario's petition be denied.  (R & R (Dkt. No. 25))

As to Nazario's ineffective assistance of counsel claim, Judge Netburn concludes that – while the Indictment was "incorrect as a matter of law" – the amendment of the indictment "was allowable because it did not change the theory of the prosecution, as reflected in the factual proffer of the indictment itself."  (Id. at 10)  The People "advanced th[e] same theory at trial" that is set forth in the Indictment:  that Nazario "kill[ed] Barker . . . 'by cutting his throat with a sharp metal object.'"  (Id. (quoting Indictment (Dkt. No. 9-12) at 29)))  Judge Netburn found that the language struck by the amendment "extraneously characterized the murder charge as a violent offense, [and] did nothing to alter what the prosecution had to prove at trial for a murder conviction."  (Id.)  Judge Netburn further concludes that the amendment caused Nazario no prejudice, since "Nazario's trial counsel spent no time attacking any assertion that could have been inferred from the erroneous classification of the crime as a 'violent offense.' . . . The entire focus of the defense was disproving that Nazario slit Barker's throat."  (Id. at 11)  Accordingly, "Nazario's [appellate] counsel was not ineffective for failing to argue that trial counsel should

14

have objected to the amendment of the indictment," for "any such objection had little possibility of success." (Id.)

As to Nazario's challenge to the sufficiency of the evidence, Judge Netburn found that "the trial record reveals sufficient circumstantial evidence that a reasonable factfinder could conclude that Nazario was guilty of second degree murder." (Id. at 1) In so concluding, Judge Netburn cites eyewitness testimony placing Nazario "within feet of Barker" at the time Barker was injured, as well as Fanzo's testimony describing the "swiping motion across Barker's throat just before Barker began spurting blood from his neck." (Id. at 12) She also cites (1) expert testimony placing the perpetrator in the same position that the eyewitnesses placed Nazario; and (2) Nazario's confession to Pecovic. (Id. at 2, 4) To the extent that Nazario argues that the eyewitnesses were not credible, Judge Netburn notes that "a federal habeas court cannot second-guess the credibility determinations of the state trial court." (Id. at 13) Given the "abundance of circumstantial evidence," a "reasonable factfinder [could] conclude that Nazario murdered Barker." (Id.)

## V.     PETITIONER'S OBJECTIONS TO THE REPORT AND RECOMMENDATION

On January 21, 2016, Nazario's objections to the R & R were entered on the docket. (See Pet. Objections (Dkt. No. 26)) Nazario's objections include the following:

1. Judge Netburn improperly applies the "unreasonable application of federal law" standard to Nazario's ineffective assistance of counsel claim (id. at 1-2, 6);

2. Judge Netburn should have concluded that the Indictment is jurisdictionally defective because it "charged the defendant with a non-existent crime, and failed to allege every essential element and did not satisfy CPL § 200.50 (7)(a) and (b)" (id. at 2-3, 4-5);

3. Judge Netburn improperly concludes that the amendment of the Indictment was permissible even though "amendment of accusatory instruments must be strictly

construed," and amendment is not permissible after a trial ends (id. at 5, 6 (internal quotation marks and citation omitted));

4. the Due Process Clause requires dismissal of a jurisdictionally defective indictment, and "prohibits the amendment of an indictment that operates to broaden the possible bases for conviction from that which appeared in the indictment" (id. at 6 (internal quotation marks and citations omitted));

5. in concluding that the evidence is sufficient, Judge Netburn relied on a fact not included in the trial record (id. at 8); and

6. the evidence tending to inculpate Nazario is "unreliable at best." (Id. at 8-9)

## DISCUSSION

## I. REVIEW OF A MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In reviewing a magistrate judge's R & R, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), a party may submit objections to the magistrate judge's R & R. Any objections must be "specific" and "written," and must be made "[w]ithin 14 days after being served with a copy of the recommended disposition." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1).

Where, as here, a party submits objections to an R & R, "[the district court] shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); see also Fed. R. Civ. P. 72(b)(3). "[O]bjections 'must be specific and clearly aimed at particular findings in the magistrate judge's proposal'" in order to invoke de novo review. See McDonough v. Astrue, 672 F. Supp. 2d 542, 547 (S.D.N.Y. 2009) (quoting Molefe v. KLM Royal Dutch Airlines, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009)). "[Where] a 'party makes only conclusory or general objections, or simply reiterates the original arguments,' the court reviews the R & R strictly for

clear error." Covington v. Five Points Corr. Facility, No. 11 Civ. 8761 (AT) (FM), 2016 WL

3407845, at *1 (S.D.N.Y. June 16, 2016) (quoting Rivera v. Colvin, No. 11 Civ. 7469, 2014 WL

3732317, at *1 (S.D.N.Y. July 28, 2014)).  A decision is "clearly erroneous" when, "upon review

of the entire record, [the court is] left with the definite and firm conviction that a mistake has

been committed." United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006) (quotation marks and

citation omitted).

The objections of parties proceeding pro se "'are generally accorded leniency,'"

Milano v. Astrue, No. 05 Civ. 6527 (KMW) (DCF), 2008 WL 4410131, at *2 (S.D.N.Y. Sept.

26, 2008) (quoting Dixon v. Ragland, No. 03 Civ. 826 (LTS) (KNF), 2007 WL 4116488, at *1

(S.D.N.Y. Nov. 16, 2007)), and "construe[d] . . . to 'raise the strongest arguments that they

suggest.'" Id. (quoting Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006)).

## II.  LEGAL STANDARDS GOVERNING HABEAS PETITIONS SEEKING RELIEF FROM STATE COURT JUDGMENTS

When reviewing a petition for habeas relief from a state court judgment, the

Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), 28 U.S.C. § 2254(d),

requires a district court to give deference to state court decisions on the merits.  See Harrington

v. Richter, 562 U.S. 86, 101 (2011) (noting that "[a] state court must be granted a deference and

latitude that are not in operation when the case involves [direct] review [of a criminal

conviction]").

Section 2254(d) provides that

[a]n application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect to any
claim that was adjudicated on the merits in State court proceedings unless the
adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has emphasized that, "[f]or purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Harrington, 562 U.S. at 101 (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000) (emphasis in original)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103. This high standard "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. at 102-03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n. 5 (1979)).

III.    **ANALYSIS**

A.    **Objections Concerning Ineffective Assistance of Appellate Counsel Claims**

All of Nazario's objections concerning ineffective assistance of appellate counsel "simply reiterate[] the original arguments" made in Nazario's petition and briefing. (See Reply Br. (Dkt. No. 23) at 15-16 (arguing that "Respondent incorrectly asserts that Petitioner must

show that the State Court decision was 'contrary to,' or an unreasonable application of' the Strickland standard"); Pet. (Dkt. No. 1) at 6-7 (arguing that the trial court lacked subject matter jurisdiction over the indictment because the indictment failed to charge a statutory offense); Reply Br. (Dkt. No. 23) at 13-14, 17-19 (arguing that the indictment was jurisdictionally defective, that amendment is not permitted after the evidence has closed, that the amendment changed the theory of prosecution, and that counsel was ineffective for failing to make a reasoned objection at trial and in failing to address the issue on appeal))  Accordingly, this Court reviews the R &R for clear error as to these issues.  Even if de novo review were warranted, however, the Court would conclude that Nazario's objections are meritless.

Petitioner first argues that Judge Netburn errs in applying the "unreasonable application of federal law" standard to his ineffective assistance of appellate counsel claim.  (Pet. Objections (Dkt. No. 26) at 2)  28 U.S.C. § 2254 provides, however, that "[a]n application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law  . . . ."  28 U.S.C. § 2254(d).  Petitioner contends that the First Department's November 14, 2013 order denying his application for a writ of coram nobis "does not constitute an adjudication of the merits of the claim," because – as Petitioner argued in his brief in response to Respondent's opposition – the First Department "issu[ed] a summary denial without an opinion."  (Pet. Objections (Dkt. No. 26) at 2; Reply Br. (Dkt. No. 23) at 16)

In Sellan v. Kuhlman, 261 F.3d 303 (2d Cir. 2001), the Second Circuit addressed "whether a federal claim is 'adjudicated on the merits' when the state court decision that

disposes of it neither discusses the claim nor references federal law." <u>Sellan</u>, 261 F.3d at 311.

Emphasizing that "[n]othing in the phrase 'adjudicated on the merits' requires the state court to have explained its reasoning process," and that "[n]owhere does the [AEDPA] make reference to the state court's process of reasoning," the Second Circuit concluded that "[f]or the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to a judgment . . . even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." <u>Id.</u> at 311-12.

Applying this test, the Second Circuit determined that Petitioner Sellan's claim had been adjudicated on the merits by virtue of an Appellate Division decision that read:

> Motion by defendant for a writ of coram nobis to vacate an order of this court dated October 3, 1988, which affirmed a judgment of the Supreme Court, Queens County, rendered March 16, 1987, on ground of ineffective assistance of appellate counsel.  (<u>People v. Bachert</u>, 69 N.Y.2d 593, 516 N.Y.S.2d 623, 509 N.E.2d 318.)

> Upon the papers filed in support of the motion and the papers filed in opposition thereto, it is

> ORDERED that the motion is denied.

<u>Id.</u> at 308 (citation omitted).

The state court order at issue in <u>Sellan</u> is substantively identical to the First Department's November 14, 2013 order denying Nazario a writ of <u>coram</u> <u>nobis</u>.  The order denying Nazario a writ of <u>coram</u> <u>nobis</u> reads as follows:

> A decision and order of this Court having been entered on June 21, 2011 . . . unanimously affirming a judgment of the Supreme Court. . . .

> And defendant-appellant having moved, in the nature of a writ of error coram nobis, for a review of his claim for ineffective assistance of appellate counsel, and for related relief,

Now, upon reading and filing the papers with respect to the motion, and due deliberation having been had thereon,

It is ordered that said application is denied.

(Nov. 14, 2013 App. Div. Order (Dkt. No. 9-11))

Accordingly, Sellan forecloses Nazario's argument that his ineffective assistance of appellate counsel claim was not adjudicated on the merits. Judge Netburn thus properly applied the "unreasonable application of federal law" standard to this claim.

Petitioner next claims that the Indictment was jurisdictionally defective and that his appellate lawyer was ineffective in failing to raise this issue. (Objections (Dkt. No. 26) at 2, 3) An indictment is jurisdictionally defective under New York law "'if it does not charge the defendant with the commission of a particular crime, by, for example, failing to allege every material element of the crime charged, or alleging acts that do not equal a crime at all.'" People v. Boula, 106 A.D.3d 1371, 1372 (3d Dept. 2013) (citations omitted).

The indictment at issue here "charge[d] [Nazario] with the commission of a particular crime"—namely, murder in the second degree. (See Indictment (Dkt. No. 9-12) at 29 ("THE GRAND JURY OF THE COUNTY OF THE BRONX BY THIS INDICTMENT, ACCUSES THE DEFENDANT ROBERT NAZARIO OF THE CRIME OF MURDER IN THE SECOND DEGREE COMMITTED AS FOLLOWS: THE DEFENDANT, ROBERT NAZARIO, ON OR ABOUT FEBRUARY 23, 1990, IN THE COUNTY OF THE BRONX, WITH INTENT TO CAUSE THE DEATH OF A PERSON, DID CAUSE THE DEATH OF SCOTT BARKER BY CUTTING HIS THROAT WITH A SHARP METAL OBJECT.")) Under New York law, "[a] person is guilty of murder in the second degree when," among other

methods for commission of the offense, "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person. . . ." N.Y. Penal Law § 125.25(1). The First Court of the Indictment thus "alleges every material element" of that crime. (See Indictment (Dkt. No. 9-12) at 29) Acknowledging that the Indictment mistakenly states that "the subject matter of this count is an armed felony," this inaccurate surplusage does not alter the fact that the First Count alleges facts that constitute a crime.[4] Accordingly, the First Count of the Indictment was not jurisdictionally defective.[5]

Nazario also argues that the trial court improperly amended the indictment, "broaden[ing] the possible bases for conviction from that which appeared in the indictment," and did so "after [the] trial was over." (Pet. Objections (Dkt. No. 26) at 5, 6) These contentions are meritless.

New York Criminal Procedure Law § 200.70 provides that

a. [a]t any time before or during trial, the court may, upon application of the people and with notice to the defendant and opportunity to be heard, order the amendment of the indictment with respect to defects, errors or variances from the proof relating to matters of form, time, place, names of persons and the like, when such an amendment does not change the theory or theories of the prosecution as reflected in the evidence before the grand

---

[4] As the Practice Commentary to New York Criminal Procedure Law Section 1.20 explains, the surplusage cited by Petitioner goes to sentencing rather than the elements of a crime. The "'armed felony' [designation] is defined as species of a 'violent felony offense' and was designed to narrow the range of available dispositions for those convicted of the same." For example, New York Criminal Procedure Law § 720.10 restricts a state court's ability to grant a youthful offender adjudication to a minor defendant who has been convicted of an "armed felony." And the New York Penal Law generally requires a court to "impose a determinate sentence of imprisonment" on a defendant who has pled guilty to a crime that constitutes an "armed felony." N.Y. Penal Law § 70.02(4)(a). Here, the "armed felony" designation set forth in the Indictment did not affect the sentence imposed by the trial judge because – as discussed above – the judge struck the erroneous surplusage from the Indictment prior to summations.
[5] To the extent that Nazario claims that the Due Process Clause also requires that his petition be granted, this Court rejects that argument for reasons already stated.

jury which filed such indictment, or otherwise tend to prejudice the defendant on the merits. . . .

    b.   An indictment may not be amended in any respect which changes the theory or theories of the prosecution as reflected in the evidence before the grand jury which filed it, nor may an indictment . . . be amended for the purpose of curing:  (a) A failure thereof to charge or state an offense; or (b) Legal insufficiency of the factual allegations; or (c) A misjoinder of offenses; or (d) A misjoinder of defendants.

N.Y. Crim. Proc. Law § 200.70.

        Here, amendment of the Indictment did not "broaden the possible bases for conviction."  As discussed above, striking the language describing the offense as an "armed felony" did not alter the material elements of the offense of second degree murder that the fact-finder was required to find.  Moreover, the amendment did not take place "after [the] trial was over," as Nazario contends.  Rather, the amendment took place "during trial" – as explicitly permitted by N.Y. Crim. Proc. Law § 200.70 – after the parties had rested and before summations.  Nazario points to no law suggesting that amendment at this point in trial does not constitute amendment "during trial" for purposes of the New York Criminal Procedure Law.[6] Accordingly, Judge Netburn properly determined that amendment was permissible and that, in turn, Nazario's counsel was not ineffective in failing to make a "proper objection" to the

_____

[6] Nazario cites People v. Twine, 121 Misc. 2d 762 (Crim. Ct. 1983) and People v. Law, 106 Misc. 2d 351 (Crim. Ct. 1980) for the proposition that "amendment of accusatory instruments is [only] allowable 'up until the commencement of trial . . . .'"  (Pet. Objections (Dkt. No. 26) at 5)  People v. Twine contains no such language.  People v. Law involves Section 100.45(3) of the Criminal Procedure Law, which addresses amendments that "add[] . . . a count charging an offense."  N.Y. Crim. Proc. Law § 100.45(3).  No such amendment is at issue here.  Nazario's contention that any amendment of an indictment must be "strictly construed" similarly relies on cases that interpret Section 100.45(3).  (See Pet. Objections (Dkt. No. 26) at 5 (quoting People v. Harper, 37 N.Y.2d 96, 98 (1975) ("We hold that if there is to be an amendment of an accusatory instrument within the scope of CPL 100.45 (subd 3), there must be strict compliance with the prescriptions of that section.")))

amendment.

## B. Objections Concerning the Sufficiency of the Evidence

Nazario's primary objection to the R & R's conclusions regarding the sufficiency of the evidence concerns the credibility of witness testimony: Nazario complains that the state "offered only incredible witness accounts that changed over the years . . . ."[7] (Pet. Objections (Dkt. No. 26) at 9) As this objection merely reiterates the arguments made in Nazario's petition and supporting brief (see, e.g., Pet. (Dkt. No. 1) at 7 (describing "inconsistencies by several prosecution witnesses"); Reply Br. (Dkt. No. 23) at 24 ("[T]he State . . . offered only incredible witness accounts that had changed over the years. . . .")), the Court reviews the objection for clear error.

"When a federal habeas petition challenges the sufficiency of the evidence to support a state-court conviction, AEDPA establishes a standard that is twice-deferential. A state court reviewing a jury verdict of guilty must . . . 'view[] the evidence in the light most favorable to the prosecution' and must not uphold a challenge to the sufficiency of the evidence if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Santone v. Fischer, 689 F.3d 138, 148 (2d Cir. 2012) (quoting Parker v. Matthews, 567 U.S. 37, 43 (2012) (internal quotation marks and citations omitted)). Moreover, "the federal court in a habeas proceeding may not overturn the state-court decision rejecting a sufficiency

_____

[7] Nazario also asserts that – in finding the evidence sufficient – Judge Netburn relied on a fact not in evidence: a report from "'one eyewitness [who had seen] Nazario with a razor in his hand.'" (Id. at 8 (quoting R & R (Dkt. No. 25) at 2)) Judge Netburn did not rely on this report in concluding that the evidence was sufficient, however. Instead, she references this eyewitness report at the beginning of her R & R only to explain why the police investigation gained traction so long after the murder. (See R & R (Dkt. No. 25) at 2)

challenge . . . unless the decision was objectively unreasonable," id. (internal quotation marks and citations omitted), and "[t]he state habeas judge's factual findings and credibility determinations are 'presumed to be correct.'" Fluker v. Falcone, No. 3:16-CV-82 (SRU), 2018 WL 3862692, at *9 (D. Conn. Aug. 14, 2018) (quoting 28 U.S.C. § 2254(e)(1)).

Here, the evidence was more than sufficient to find Nazario guilty beyond a reasonable doubt. Contrary to Nazario's arguments, numerous eyewitnesses – including witnesses called by the defense – offered largely consistent accounts of the crime. The eyewitnesses all observed a fight between Barker and Lopez, and described the development of the fight in essentially the same way. All of the witnesses saw Nazario position himself by Barker and Lopez immediately before Barker's throat was cut. Several described Nazario fleeing the scene immediately after Barker's throat was cut. While no witness testified that he or she saw a knife or razor in Nazario's hand, no such proof was required to find Nazario guilty. Indeed, Fanzo's testimony alone likely provides a sufficient basis for conviction.

Fanzo testified that after the fight between Lopez and Barker ensued, he saw Nazario "run over to his car, [and] open[] his door, and . . . c[o]me running back" across the street "with his hand closed really tight." (Tr. at 713, 779) "When he came running back," Nazario "[p]ut Scott Barker in a headlock," and made "a quick motion" (id. at 713-14), by which Nazario's "right hand c[ame] across the front of [Barker's] neck almost to the crook of [Nazario's] elbow," and Nazario "ma[de] a swiping motion going to the right." (Id. at 725) Fanzo's account was corroborated by both Dr. Gill and Dr. Hirsch, who testified that Barker suffered a seven-inch wound stretching from the left of his neck and upward along his jawbone, towards his right earlobe, and another, nine-inch-long wound on the right side of his neck. (Id. at

25

434-36, 1117-18)  Such wounds are fully consistent with the "swiping motion going right" across Barker's neck described by Fanzo.

Thomas Cataldo and Carlanne Cataldo also both saw Nazario position himself right beside Barker as Barker held down Lopez, and both testified that Nazario was the only person in a position to harm Barker.  (Id. at 336, 341, 344, 491, 503)  Dr. Gill and Dr. Hirsch both testified, consistent with these accounts, that the perpetrator "was behind the decedent and to the right."  (Id. 441, 1116)

The Court concludes that the evidence was sufficient to prove Nazario's guilt of second degree murder beyond a reasonable doubt.

## CONCLUSION

For the reasons stated above, the Court adopts Judge Netburn's R & R in its entirety, and Nazario's petition is denied.

Because Nazario has not made a substantial showing of the denial of a constitutional right, no certificate of appealability will issue under 28 U.S.C. § 2253(c)(1)(A). This Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. Cf. Coppedge v. United States, 369 U.S. 438, 444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a non-frivolous issue).  The Clerk of Court is directed to mail a copy of this order to Petitioner and to close this case.

Dated:  New York, New York
      January 10, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge